IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

UNITED STATES OF AMERICA

vs.                                                              Case No.:  3:14cr3/MCR

DOUGLAS EDWARD HENDERSON
_____/

### DEFENDANT'S MEMORANDUM IN AID OF SENTENCING

COMES NOW Defendant Douglas Henderson, by and through undersigned counsel, and hereby respectfully submits this Memorandum to assist this Honorable Court in the calculation of Defendant's recommended guideline range under the U.S. Sentencing Guidelines, and to assist the Court in the exercise of its discretion when imposing a sentence upon Mr. Henderson pursuant to 18 U.S.C. § 3553(a) for the offenses he pled guilty to on February 1, 2014.  Each of the issues addressed in the Court's Order of August 4, 2014, will be addressed below.

### INTRODUCTION

The Court has before it a most unusual case.  It is a tax case in which expert testimony establishes that the IRS owes the Defendant money and it is a mortgage fraud case in which there is substantial evidence that the fraud did not result in an actual loss to the mortgage company.  Apparently in reaction to these unusual facts, the government has attempted to draw attention to peripheral issues such as a 2014 dispute over dock planks.  The Defense would suggest that those issues are immaterial.  The central issue to be decided is how the need to impose a just sentence is affected by the absence of actual loss in both the tax and mortgage counts.

Wherefore, Counsel for Douglas Edward Henderson submits the following:

I.   RESTITUTION IN THE TAX COUNTS

In a Title 26 tax case a determination by a sentencing court of whether to require restitution to the IRS and if so in what amount, presents several complications. The court must first determine if the amount of taxes due and owing has been either acknowledged or conclusively established. It must also determine the actual loss suffered by the IRS as opposed to the loss for guidelines purposes. Finally, it must determine if it wishes to exercise its discretion to impose a specific restitution number or allow that number to be determined in subsequent civil proceedings. For the reasons described below Defendant suggests the Court defer a determination of taxes due and owing to subsequent civil proceedings.

"A federal district court has no inherent authority to order restitution and may do so only as explicitly empowered by statute." U.S. v. Valladares, 544 F.3d 1257 at 1269 (11th Cir. 2008). The restitution statute ordinarily relied on by sentencing courts, 18 U.S.C. §3663, "does not authorize restitution orders compelling payment to the IRS for a Title 26 offense. U.S. v. Campbell, 552 Fed.Appx. 339 at 344 (11th Cir. 2014). A number of courts have concluded that discretionary authority exists to impose restitution in tax cases under the statute authorizing supervised released, 18 U.S.C. §3583. *See e.g.* U.S. v. Smith, 430 Fed.Appx. 357 (5th Cir. 2011) and U.S. v. Campbell, 552 Fed.Appx. 339 at 344 (11th Cir. 2014). However, the court may impose a requirement that the IRS be repaid "only if the specified sum of taxes . . . has been acknowledged, conclusively established in criminal proceedings or finally determined in civil proceedings." U.S. v. Smith, supra at 357. *Also see* U.S. v. Jacob, 242 F.3d 391 (10th Cir. 2000)(unpublished) ("conclusively established" means a definitive determination or adjudication by a court or jury of the amount of taxes owed" and U.S. v. Touchet, 658 F.2d 1074 at 1076 (5th Cir.

2

1981). The government has not met its burden of "conclusively establishing" that Mr. Henderson owes any taxes. David Williams, a well-qualified tax accountant has determined that Mr. Henderson's company is entitled to carry back the $2,600,000 in losses ("Net Operating Losses") it experienced in 2012. As a consequence of those losses even if "[the government] is entirely correct "the tax liabilities of 2009 and 2010 would be extinguished and the IRS owes Mr. Henderson a net refund.[1] (Doc. 59, p.6) The amount of that refund depends on whether certain compensation is treated as dividends or income. If treated as ordinary income, as Mr. Williams said it should, the government owes Mr. Henderson $166,882. If treated as dividends the refund would be $17,835. (Doc. 59, p. 6) In any event, the losses suffered by Mr. Henderson's company in 2012 have altered his tax obligations. Rather than owing the IRS substantial sums Mr. Henderson is owed a refund by the IRS.

---

[1] The government contends that a later attempt in one of the company's returns to carry forward a portion of the Net Operating Loss ("NOL") disqualifies any subsequent attempt to carry the losses back. Mr. Williams responded that a taxpayer may not carry a loss forward unless he elects to do so in the year of the loss. His testimony is supported by Defendant's Exhibit 23 which explains NOL and how they may be carried back, Exhibit 26, the IRS code provision allowing the carry back of NOL and Exhibit 24, the IRS guideline (at page 20, line 11) which requires that an election to carry forward must be made on the return reporting the NOL and that "once made the election is irrevocable." Henderson, having not elected to carry the NOL forward may then carry it back. The government's opposition is based on the testimony of their expert, Doug Franzen. Mr. Franzen in turn relied on his belief that the election described above requires that a statement of explanation be attached. He subsequently acknowledged that he was unaware that the requirement of a statement had been deleted. (Doc. 58, pp. 59-60) Moreover, Franzen's suggestion that having failed to elect to carry the NOL forward in his return, Henderson could later elect to carry it forward is contrary to case law. See Branurn v. Commissioner of Internal Revenue, 17 F.3d 805 at 808 (5th Cir. 1994) (". . . the rule is clear: a taxpayer who fails to make an effective election is required to carryback both his regular and his alternative tax NOL") and Georges v. IRS, 916 F.2d 1520 (11th Cir. 1990)("The plain meaning of the relevant statute supports the district court's holding that this election is irrevocable").

Should the Court opt for some form of restitution the rules for determining losses for restitution purposes are different than those for sentencing. U.S. v. Huff, 609 F.3d 1240 at 1247 (11th Cir. 2010). Unlike sentencing loss "[a] restitution award must be based on the amount of loss <u>actually</u> caused by the defendant's conduct." U.S. v. Huff, supra at 1247. It is the government that "bears the burden of proving the amount of loss." A sentencing court "cannot make the victim a windfall" U.S. v. Boccagna, 450 F.3d 107 at 117 (2nd Cir. 2006). In this case the government has failed to prove the IRS lost anything. Indeed, applicable tax laws require the IRS to refund moneys to Mr. Henderson's company.

## II.     Misclassification of Compensation to Mr. Henderson

The tax loss calculation in the Presentence Investigation Report ("PSR") is based, in part, upon the government's improper disallowance of certain deductions by Mr. Henderson's "regular" C Corporation, and the subsequent treatment of those amounts as dividends to Mr. Henderson. (Doc. 25, pp. 25-26) The government similarly disallowed deductions to the Subchapter S Corporation, which was the successor to the C Corporation.

The defense contends that the government's mistaken classification of certain deductions in the instant case has exaggerated the total amount of tax loss the government claims is due as a result of Defendant's wrongful tax-related conduct. The mistaken classification of deductions has also exaggerated the restitution figure the government claims is owed the U.S. Treasury.

The defense presented the testimony of two expert witnesses to support its position on this issue. (Doc. 47; Doc. 48)

Nathan Gerald Cohen was one of the expert witnesses the defense called, in part, to help explain the problems with the government's misclassification of compensation earned by Mr. Henderson.  Mr. Cohen is employed as a lawyer with the firm of Sutherland, Asbill & Brennan.  He is a Magna Cum Laude graduate of the Harvard Law School, has practiced tax law for fifty-three (53) years, previously served as Chair of the Tax Law Section of the American Bar Association ("ABA"), served as Chair of the ABA's Tax Policy Committee, served as the presidentially appointed chief counsel for the Internal Revenue Service, and has testified as an expert witness for the SEC and FDIC. (Doc. 48, pp. 2-4)

David Williams also testified as an expert witness for the defense in this cause, in part, to help explain the defense position on the misclassification of compensation, and its impact on the government's tax loss calculation in this case. Mr. Williams has been employed continuously as a Certified Public Accountant since 1988.  He began work as a CPA with Arthur Anderson in 1988, and joined Pierce Bevell in Birmingham, AL, in 1992.  He has focused his work over the 25-year period primarily in the area of tax returns. (Doc. 47, p. 3-4)

Mr. Cohen testified that certain amounts which had been incorrectly charged to job accounts on Henderson Electric's ledgers should have been charged to Defendant Henderson's salary bonus account.  As such, those amounts should have been treated as compensation paid to Defendant Henderson, and deductible by the company as business expenses. (Doc. 48, pp. 8-12)  When asked about the reasonableness of the amounts paid to Mr. Henderson as compensation, Mr. Cohen explained that Mr. Henderson's

5

company's generation of large gross income during the relevant time periods[2], justified his expert opinion that the amounts of compensation that were paid to Mr. Henderson constituted reasonable compensation, especially in light of Mr. Henderson's significant role and contributions to the companies. (Doc. 48, pp. 12-14)

Mr. Williams had prepared the 2012 tax return for Mr. Henderson, for the Henderson Family Trust, and for Mr. Henderson's company. He explained how a $2,600,000 loss suffered by the company that offset the taxes originally owed in 2008, 2009 and 2010. In fact, as Mr. Williams testified, the government currently owes the corporation a refund. (Doc. 47, pp. 7-26) Mr. Williams, like Mr. Cohen, explained how the treatment of certain payments to Mr. Henderson would impact the calculation of net taxes owed, depending on whether the payments were treated as compensation or constructive dividends. (Doc. 47, pp. 19-21) He further testified that, whether or not the compensation that had been paid to Mr. Henderson is treated as compensation or as constructive dividends, a net tax refund would still be due the "Henderson entities." (e.g., Mr. Henderson, his two companies, and the Henderson Family Trust). (Doc. 47, pp. 25-26; Doc. 59, p. 6) Finally, Mr. Williams used the calculations illustrated in Exhibit 14, to

---

[2] As the collective testimony of Mr. Henderson, Mr. Cohen and Mr. Williams show, along with the documents that were entered into evidence at prior hearings in this matter by the government and defense, Mr. Henderson served as the primary officer of two corporations, was the primary person who developed business for the sizable corporations, and did hands-on work on their business. In the year ending March 31, 2008 (which has been called fiscal 2007) one corporation ("The C Corporation") had gross receipts of approximately $14,132,000, in fiscal 2008 the same corporation had gross receipts of $14,507,000, and in fiscal 2009 $10,508,000. The C Corporation was succeeded by the S Corporation which in its year ended December 31, 2010 had gross receipts of $17,416,000. Thus the two corporations had over $20,000,000 of gross receipts in the 2010 year.

explain how it is that the government currently owes the Henderson entities a refund. (Doc. 47, pp. 21-26; Doc. 59, p. 6)

### III.   DETERMINATION OF LOSS IN COUNTS EIGHT AND NINE

Counts Eight and Nine charge a fraud related to the short sale of a condominium. Mr. Henderson has admitted the fraud but contests the amount of loss suffered by the mortgage company. It is the government's burden to prove the loss attributable to these county and they have failed in that burden.

The factual basis of these counts are largely uncontested. In 2013, Mr. Henderson was trying to reduce his expenditures in order to compensate for a dramatic drop in income. (Doc. 51, pp. 5-6, 11 and 19) Towards that end he attempted to sell three properties he had purchased in better times. These were, the condominium that is the subject of these counts, his ranch in Nashville and the harbor house in Destin. (Doc. 51, pp. 11 and 19) He managed to sell the Nashville ranch and put the proceeds from that sale back into the company. (Doc. 51, pp. 19-21) He was unsuccessful in his efforts to sell the condominium and the harbor house and was forced to stop paying the mortgages on both. (Doc. 51, pp. 22-23 and 31) As a result, the harbor house was foreclosed. (Doc. 51, p. 23) Having been similarly unsuccessful in this attempts to sell the condominium, Henderson induced the mortgage company to agree to a short sale. (Doc. 51, p. 24) It is that inducement that is the subject of the fraud allegations. The short sale took place the last week of February 2013 at a price of $664,000. (Doc. 51, p. 24) Mr. Henderson borrowed the money for the short sale from his company's line of credit. (Doc. 51, p. 25) Mr. Henderson then continued his efforts to sell the condominium. (Doc. 51, p. 27) Finally, on May 17, 2013, he managed to sell the condominium for $600,000. (Doc. 51, pp. 27-28) This was the price he could get. (Doc. 51, p. 27)

Counting sales cost, Henderson's purchase from the mortgage company and resale of the condominium cost him more than $98,000. It is the government's contention that the mortgage company's loss was the full value of its mortgage less what it secured in the short sale, a total of $449,061.10. (Doc. 25, p. 12) Mr. Henderson, while conceding the fraud contends that the short sale did not cause a loss by the mortgage company.

The burden of proof is on the government. In order to prevail they must prove that but for the fraud the mortgage company would have collected the remainder owed on the mortgage. This they have not done. The mortgage company had two ways to collect the value of its mortgage; sale of the collateral, which is the condominium, or collect what is owed on the mortgage from Mr. Henderson. The government has failed to prove that either would have succeeded. When sold by Mr. Henderson, in an arm's length transaction to a third-party, the condominium brought only $600,000, roughly half of the mortgage value and $64,000 less than Mr. Henderson paid them in the short sale. (Doc. 51, pp. 24 and 28) Plainly the collateral would not cover the loss. The government must then prove that the mortgage company could have foreclosed and obtained and collected a judgment against Mr. Henderson for the remainder of the mortgage. This too, is unproven and unprovable. Mr. Henderson's company lost $2,600,000 in 2012. *See* 2012 amended tax return at Defendant's Exhibits 11 and 12. The financial problems worsened in 2013. (Doc. 51, pp. 5-6) His only other source of funds, a $2,000,000 line of credit was exhausted in 2013. (*See* Defendant's Exhibit 3 and Doc. 51, pp 15-18) The other similar property, the harbor house also went into default and was foreclosed. (Doc. 51, pp 22-23) There is no reason to believe that the mortgage company could have collected

from Mr. Henderson a judgment for the remainder of the mortgage. More importantly, the government has not proven they could.

The Eleventh Circuit has dealt with a case strikingly similar to this, <u>U.S. v. Reinhard</u>, 407 Fed.Appx. 389 (11th Cir. 2011). In <u>Reinhard</u>, the defendant had fraudulently induced a bank into modifying a mortgage on which he subsequently defaulted. <u>Reinhard</u>, supra at 2. The government sought to attribute the full amount of the mortgage as the loss for both sentencing and restitution purposes. Notably, in <u>Reinhard</u>, the loss calculations for both purposes would have been the same that is the loss attributable to <u>Reinhard's</u> fraud. <u>Reinhard</u> argued that because he paid the bank for the loan modification the bank was actually in a better position for having agreed to the modification. That is precisely Defendant's argument here. Because Mr. Henderson paid the mortgage more in the short sale than it could have sold the condominium for and because they could not have collected the remainder from him, the short sale actually improved the mortgage company's position. (Doc. 51, 29-31) In <u>Reinhard</u> the Eleventh Circuit found the offense level argument moot but notes its skepticism. *See* <u>Reinhard</u> supra at 2. ("We are skeptical of the Government's argument"). The court also emphasized that "The only loss relevant to Reinhard's offense level under the Guidelines is pecuniary harm that resulted <u>from the offense</u>." They then went on to analyze the restitution issue which is essentially the same. There they concluded that:

> . . . the loss that could fairly be said to have resulted from that offense in loss proximately caused by the modification itself, as opposed to the original loan . . . if there was a loss that was already going to be incurred anyway, then that's not attributable to the later fraud. . . . the Government bears the burden of proving that loss by a preponderance of the evidence . . . therefore the Government had to prove that the bank's losses on the modified loan exceeded

those the bank would have incurred when Reinhard defaulted on the original loan." Reinhard supra at 3.

The language of Reinhard is equally applicable to this case. The government must prove that the mortgage company would not have suffered its losses absent the charged fraud. This they have not done. Those losses, therefore, may not be attributed to Mr. Henderson.

## IV.    SECTION 3553 (a) SENTENCING FACTORS

**Introduction**

The Sentencing Guidelines are no longer mandatory. United States v. Booker, 543 U.S. 220, 260-61 (2005). Consequently, the range of choice in sentencing dictated by the facts has been significantly broadened. Gall v. United States, 552 U.S. 38, 59 (2007) (finding a sentence outside the Guidelines to be reasonable); Kimbrough v. United States, 552 U.S. 85, 100 (2007) (noting that courts may vary from Guideline ranges based solely on policy considerations, including disagreements with the Guidelines); Rita v. United States, 551 U.S. 338, 351 (2007) (holding that a district court may consider arguments that "the Guidelines sentence itself fails properly to reflect § 3553(a) considerations"); Cunningham v. California, 549 U.S. 270, 286 (2007) (stating that judges are no longer tied to the sentencing range indicated in the Guidelines but are obligated to "take account of" that range along with the sentencing goals Congress enumerated in 18 U.S.C. § 3553 (a) of the Sentencing Reform Act). District courts must "give respectful consideration to the Guidelines," but are permitted "to tailor the sentence in light of other statutory concerns as well." Kimbrough, 552 U.S. at 101 (quoting Booker, 543 U.S. at 245-46). These cases "mean that the district court is free to make its own reasonable application of the § 3553(a) factors, and to reject (after due

consideration) the advice of the Guidelines." Kimbrough, 552 U.S. at 113 (Scalia, J. concurring).

The Sentencing Reform Act "contains an overreaching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing, including 'to reflect the seriousness of the offense,' 'to promote respect for the law,' 'to provide just punishment for the offense,' 'to afford adequate deterrence to criminal conduct,' and 'to protect the public from further crimes of the defendant.'" Kimbrough, 552 U.S. at 101 (quoting 18 U.S.C. § 3553(a)). The statute further provides that "in determining the appropriate sentence, the court should consider a number of factors, including 'the nature and circumstances of the offense,' 'the history and characteristics of the defendant,' 'the sentencing range established' by the Guidelines, 'any pertinent policy statement' issued by the Sentencing Commission pursuant to its statutory authority, and 'the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.'" Id. (quoting 18 U.S.C. § 3553(a).

**The nature and circumstances of the offenses**

The tax offenses in this case concern the filing of a number of personal tax returns, corporate tax returns, and Trust returns. As reflected on the subject returns, during the relevant time periods, Mr. Henderson, his company, and the family Trust cumulatively paid several million dollars in taxes to the United States Treasury. However, at the time the tax returns were filed, the returns misidentified and misstated the total income figures to be less than they actually were for the companies, Mr. Henderson, and the Trust. As a result of the incorrect figures, additional taxes which

should have been paid were not paid. The actual amount that may or may not be owed to the government at the present time is, as the Court is well aware, still under dispute. Subsequent to the filing of the tax returns, changed economic circumstances resulted in large financial losses which, Defendant's counsel and his Defendant's expert witnesses believe, substantially reduce, if not eliminate altogether, the total amount of taxes that are now owed the government. In any event, Mr. Henderson has retained reputable tax professionals to assist him in resolving his tax liability, and will make amends with the government.

The Defendant's conduct in regard to mail and bank fraud charges in this case has been explained earlier herein. With regard to those charges, Defendant's counsel also contend that the amount of loss (and restitution due) as a result of the bank-related fraud charges is less than the amount the government claims was caused by Defendant's actions, and that Defendant has fully reimbursed the financial institution for the fair market value of the mortgaged property.

**The history and characteristics of Defendant Douglas Henderson**

At age 52, after a life-time of hard work and dedication to his family, and his companies and employees, Douglas Henderson stands before the Court to be sentenced on five counts of filing false tax returns, two counts of aiding and assisting in the preparation of false tax returns, one count of conspiracy to commit mail or wire fraud, and one count of mail fraud. He has been employed throughout his adult life, has been married for over 30 years, has raised two children, and has no history of drug or alcohol abuse. He is contrite, promises he will never again violate the law, and asks the court to consider all the good he has done in his life.

Mr. Henderson has given of himself to a number of charitable causes, including his church, and has donated his time and resources to organizations that teach, feed, and help others. He has done so for many years, beginning well prior the government's investigation of this case. Mr. Henderson is also not a dangerous man, who needs to be imprisoned in order to protect the public. Accompanying the Pre-Sentence Report are more than six dozen letters sent by friends, colleagues, family, clergy, civic and military leaders, co-workers, and others that know Douglas ("Doug") Henderson, who uniformly attest to his admirable kindness, loyalty, good work, and integrity.

Examples of Mr. Henderson's character abound throughout the many letters that accompanied his Presentence Investigation Report ("PSR"). When describing what type of person Mr. Henderson is, Ruth Kimble wrote:

> "I have known Doug for approximately seven years, meeting him through a mutual friend. Doug is a generous and kind person who is a cornerstone of the region. He is an active member of the community and involved with several local charities. He is involved in several non-profits including soup kitchens, Catholic charities for wounded vets, food banks, and the Christmas Angel programs. He has helped children with cancer and is a contributor to St. Jude Hospital. He is a devoted father, husband, grand pa, and friend."

Similarly, Renee Armond wrote:

> "I grew to love and respect him because of his quiet kindness and generosity to so many here, but especially because of his abiding care for people and things he felt responsible to and responsible for – his extended family (as he apparently regards us) of employees and friends."

In describing Mr. Henderson's good character, Elia Saxer said this about Mr. Henderson:

> "Doug Henderson is a man with a charitable heart. I cannot recall a time when if something was needed at school and Doug was asked that he did not offer not only a willingness to help but always did so with an amazing spirit of generosity . . . Doug and Gloria were active parishioners at St. Mary's until they moved and began attending St. Peter's in Mary Esther. Every Sunday if I looked over, there were Doug and Gloria. We sat in the same choir side of the church for years. When you pray together with folks you really do get to know them and their families. Gloria and I have

> participated in a cenacle prayer hour for over 20 years. I am certain that there was not a fund raising effort at St. Mary's that they did not participate in substantially. They supported the community of St. Mary's consistently with either their hard work volunteering or their contributions financially. I know that they supported our St. Vincent DePaul ministry which reaches out to the poor as well. I have watched them over the years help more than one troubled youth either by opening the doors of their home to allow them to live in their own home, or by helping them with the purchase of a car. There does not seem to be any limit to the generosity of the Hendersons . . . Doug and his family stand as a fine example of what a loving family is. There is deep love between Gloria and Doug that I have witnesses [sic] over the years since I have known them. It is inspiring to all who are blessed by having them in their lives."

As a final example of the types of comments made by persons who know Mr. Henderson, Kevin McManus wrote:

> "I consider Mr. Henderson to be honest, generous, kind, considerate, and compassionate. He maintains the highest level of integrity and he is a godly man, a devoted husband, father, grandfather and a well-rounded spiritual and business leader. Basically, a man I would and have entrusted with the lives of my family."

There are many more letters expressing similar observations and opinions. They all share the same sentiment of admiration for Douglas Henderson, and their view that he is a man of integrity and a good and loyal friend. The letters describe for the Court that the man they know is not the man the government has portrayed during the recent sentencing hearings, and in its sentencing memoranda. The Douglas Henderson described in the letters is a man of God, who cares about others, and who is a good father and a selfless employer, who enriches the lives of all whom he touches. He is a good friend and a kind person, who cares for his family, for his friends, and for strangers in need. His friends and employees know him as a decent, honest and hard-working man.

The letters also reflect that Mr. Henderson has the solid support of his family, friends, and many others; something the Court knows is an essential ingredient to

14

rehabilitation and the assurance that Mr. Henderson will not again commit a crime. In determining the sentence to impose, the Court should consider the good Mr. Henderson has done in his life, and the esteem to which he is held by so many. *See, e.g.*, <u>Gall v. United States</u>, 552 U.S. 38 at 43, 56-59 (noting that district court could consider "flood of letters" evidencing that family and friends, who uniformly praised his character and work effort, as a mitigating factor under § 3553(a)).

Mr. Henderson's risk for recidivism is extremely low. For all male offenders in Criminal History Category I the recidivism rate is 15.2%. For all male offenders over 50 at the time of sentencing, however, the rate for Category I offenders is only 6.2%, and for persons who were ever married the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half of those who do have a drug history. For those like Mr. Henderson, who are married, drug free, and over 50 years of age, the recidivism rate is certainly much lower. *See*, U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 28.

**The Sentencing Range Established by the Guidelines**

The Guidelines' graduated system of increasing culpability aligned with increasing loss is skewed, especially when it fails to measure a host of other factors that may be important, and may be a basis for mitigating punishment in a particular case. As a result, courts oftentimes depart from the Guidelines when sentencing defendants for non-violent financial crimes. In fiscal year 2012, sentences below the guideline range were imposed in 47.5% of all fraud cases; 23% were government-sponsored, 23.8% were non-government sponsored. *See* U.S. Sent'g Comm'n, *2012 Sourcebook of Federal Sentencing Statistics*, tbl. 27.

rehabilitation and the assurance that Mr. Henderson will not again commit a crime. In determining the sentence to impose, the Court should consider the good Mr. Henderson has done in his life, and the esteem to which he is held by so many. *See, e.g.*, <u>Gall v. United States</u>, 552 U.S. 38 at 43, 56-59 (noting that district court could consider "flood of letters" evidencing that family and friends, who uniformly praised his character and work effort, as a mitigating factor under § 3553(a)).

Mr. Henderson's risk for recidivism is extremely low. For all male offenders in Criminal History Category I the recidivism rate is 15.2%. For all male offenders over 50 at the time of sentencing, however, the rate for Category I offenders is only 6.2%, and for persons who were ever married the rate is 9.8%. For those with no history of illicit drug use, the recidivism rate is half of those who do have a drug history. For those like Mr. Henderson, who are married, drug free, and over 50 years of age, the recidivism rate is certainly much lower. *See*, U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines*, at 28.

**The Sentencing Range Established by the Guidelines**

The Guidelines' graduated system of increasing culpability aligned with increasing loss is skewed, especially when it fails to measure a host of other factors that may be important, and may be a basis for mitigating punishment in a particular case. As a result, courts oftentimes depart from the Guidelines when sentencing defendants for non-violent financial crimes. In fiscal year 2012, sentences below the guideline range were imposed in 47.5% of all fraud cases; 23% were government-sponsored, 23.8% were non-government sponsored. *See* U.S. Sent'g Comm'n, *2012 Sourcebook of Federal Sentencing Statistics*, tbl. 27.

In some circumstances, such as the instant case, the calculated loss figure overstates the actual loss suffered as a result of Defendant's actions. In this case, as a result of recent losses Defendant and his business sustained, there are no unpaid taxes currently owed as a result of Defendant's conduct.

**Any Pertinent Policy Statement**

In determining the appropriate sentence, this Court must consider "the need to provide restitution to any victim of the offense." *See* 18 U.S.C. § 3553(a)(7); *see also, e.g.,* United States v. Menyweather, 447 F.3d 625, 634 (9th Cir. 2006) (acknowledging district court's discretion to depart guidelines to impose probationary sentence, since the "goal of obtaining restitution for the victims of Defendant's offense . . . is better served by a non-incarcerated and employed defendant"); United States v. Peterson, 363 F. Supp. 2d 1060, 1061-62 (E.D. Wis. 2005) (granting a variance so that defendant could work and pay restitution). Given the precarious financial condition of Defendant's business and personal finances, as witness testimony established during earlier hearings before the Court, it is clear that imposition of a sentence that would allow Defendant to continue to work, and manage his business during a difficult financial period, would greatly help Defendant in fulfilling his responsibility in paying any fines or penalties which may be imposed by the Court. As noted in Part F of Defendant's PSR, (Doc. 25) when discussing factors that may warrant a sentence outside the guidelines, one of the listed factors is the extent to which Defendant's incarceration may negatively impact his business, and the continued employment of its numerous employees. If Mr. Henderson is sentenced to probation, home confinement, or a halfway house, he can continue to work, attempt to improve the performance of his company, and begin making restitution. The

taxpayers and the U.S. Treasury would benefit much more if Mr. Henderson is given a sentence that allows him to continue to work, and manage his company.

If the Court were to conclude that a variance from Mr. Henderson's recommended guideline sentence, Defendant's counsel suggest a split sentence, with some combination of probation, supervised release, a halfway house, home confinement and community service is sufficient to fulfill the purpose of sentencing outlined in 18 U.S.C. § 3553(a)(2).

**The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct**

In determining an appropriate sentence in this case, the Court must consider the need to avoid unwarranted disparities among defendants with similar criminal histories convicted of similar criminal conduct. 18 U.S.C. § 3553(a)(6). A sentence should be imposed proportional to other sentences imposed on criminals who have committed similar non-violent financial crimes. *See, e.g.*, United States v. Stiff, Case Number 0:14-cr-60077 (S.D. FL, 2014) (13 months imprisonment for making and subscribing false tax returns involving the failure report approximately $2.1 million in partnership income); United States v. Freedman, Case No. 1:11-cr-00599 (S.D. NY, 2013) (1 year and 1 day imprisonment for four counts of making & subscribing false tax returns involving failure to report $2.4 million in income to the IRS); United States v. Hergert, 4:09CR3019 (D. NE, 2009) (6 months home confinement and 60 months probation for financial institution fraud of $3,000,000); see also, United States v. Herink, 4:09CR0168 (D. NE., 2012) (18 months incarceration for fraud-related losses totaling $5,111,026.91).

On April 15, 2008, a billionaire, Igor Olenicoff, who agreed to pay a $52 million settlement to settle a federal criminal tax case was sentenced by United States District

Court Judge Cornac Carney in Santa Ana, California, to two years probation and 120 hours of community service. Forbes magazine once estimated Olenicoff's personal fortune at $1.7 billion. In that case, federal prosecutors had recommended that Olenicoff be placed on probation for three years. A number of other cases involving high-profile failure to file cases

The defendant has already suffered serious consequences as a result of the crimes that he committed; he and his business have been debarred from doing business with the United States government, its agencies, and departments. Following the entry of his guilty pleas in this case, contractors began refusing to pay for work that he and his firm already completed on government projects. This has caused significant legal problems and expense for Mr. Henderson, and his company, in attempting to recover payments due them. Given the financial strain his business currently faces, the civil penalties and claims the IRS will no doubt seek to recover from Mr. Henderson, and the fact he now risks losing his business and will suffer the stigma of the present felony offenses will help deter others from engaging in similar conduct. The value of imposing a lengthy period of incarceration in the instant case appears to be marginal, at best. The defendant is unlikely to reoffend. Society will also be protected from future crimes by the defendant by the court's imposition of supervised release.

WHEREFORE, for the foregoing reasons, counsel for Defendant Henderson respectfully suggest that a variance below the recommended guideline range would be sufficient to satisfy the purposes of sentencing.

/s/ David L. McGee
David L. McGee
FL Bar No. 220000
dlm@beggslane.com
Gregory R. Miller
FL Bar No. 284777
grm@beggslane.com
Beggs & Lane RLLP
P.O. Box 12950
Pensacola, FL  32591-2950
(850) 432-2451
*Attorneys for Douglas Edward Henderson*

## CERTIFICATE OR SERVICE

I HEREBY CERTIFY that on this the 26th day of September, 2014, the foregoing was electronically filed with the Clerk of Court using the CM/ECF system which will send notification of such filing to counsel for all parties of record.

/s/ David L. McGee
David L. McGee
FL Bar No. 220000
Gregory R. Miller
FL Bar No. 284777